UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                     :             05-md-1696 (SHS)

IN RE: SIERRA WIRELESS, INC.        :    (This document relates to all actions)
SECURITIES LITIGATION            :

                                       :        OPINION AND ORDER
-------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs – purchasers of securities in Sierra Wireless, Inc ("Sierra") during the period from January 28, 2004 to January 26, 2005 (the "class period") – bring this action against Sierra and three of its corporate officers pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  In their consolidated amended class action complaint, plaintiffs claim that defendants artificially inflated the value of Sierra's stock by issuing statements that contained material misrepresentations and omissions regarding various aspects of the company's future performance and business strategy.  It does not allege that defendants misstated any past financial results.  The complaint further asserts control person liability against three individual corporate officers pursuant to section 20(a) of the Exchange Act.

Defendants have now moved to dismiss the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.  They contend that the complaint does not plead securities fraud with the particularity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified in various sections of 15 U.S.C.) ("PSLRA"), and therefore should be dismissed.  In addition, defendants claim protection under the PSLRA's "safe harbor" for forward-looking statements, 15 U.S.C. § 78u-5(c).

Defendants' motion to dismiss the complaint is granted for the reasons set forth at length in this Opinion.  In sum, the statements that form the basis of this action are broadly optimistic projections of future performance that plaintiffs allege are false or misleading.  However, plaintiffs have not specified why or how these statements are false or misleading and therefore have not supplied sufficient facts in their lengthy complaint to support their allegations.  The securities laws neither require corporate officers to adopt a crabbed, defeatist view of the company's business prospects nor permit dissatisfied shareholders to assert serious allegations of fraud based on the perfect hindsight afforded by the passage of time.

## I.      BACKGROUND

The complaint alleges the following relevant facts, which the Court assumes to be true for the purposes of this motion to dismiss.

### A.      Procedural History

This multidistrict litigation consists of nine separate class actions which were centralized in the Southern District of New York pursuant to 28 U.S.C. § 1407 by the Judicial Panel on Multidistrict Litigation and assigned to this Court for coordinated or consolidated pre-trial proceedings.  (See Transfer Order of the Judicial Panel on Multidistrict Litigation dated Aug. 22, 2005.)  This Court subsequently consolidated the actions for pretrial purposes pursuant to Fed. R. Civ. P. 42(a), appointed lead plaintiffs, approved their selection of lead counsel, and directed them to file a consolidated amended complaint.  (See Order dated Dec. 16, 2005.)  Subsequent to the filing of that complaint, defendants moved to dismiss the consolidated action.

B.     The Parties

Sierra, a Canadian corporation with its principal place of business in British Columbia, is in the business of developing telecommunications products such as wireless data modems and mobile phones.  (Am. Compl. ¶ 7.)  During the class period, Sierra's "key products" were (1) the AirCard, which is a PC card that enables laptop computers to connect to the internet; (2) embedded modules, which are built into handheld devices made by original equipment manufacturers ("OEMs"); (3) vehicle-mounted modems and software that permits remote wireless access; and (4) the Voq Professional Phone, a multi-functional mobile device similar to a Blackberry or Treo.  (Id. ¶ 25.)

David B. Sutcliffe was Sierra's Chairman and Chief Executive Officer during all relevant times.  (Id. ¶ 8.)  David G. McLennan became the Chief Financial Officer of Sierra in March 2004 and thereafter held that position for the remainder of the class period.  (Id. ¶ 9.)  Jason W. Cohenour served as Sierra's Senior Vice President for Worldwide Sales until August 2004, at which time he became the company's Chief Operating Officer, a position which he held until October 2005.  (Id. ¶ 10.)  As Sierra's senior officers, Sutcliffe, McLennan, and Cohenour (the "Sierra Officers") had access to non-public information pertaining to the company's finances, products, markets, and business prospects.  (Id. ¶ 12.)

The lead plaintiffs in this multidistrict class action are the National Elevator Industry Pension Plan, Cary Boyko, Andy Hua, John Travan, Roger S. Curry, and James M. Dowd.  Each lead plaintiff purchased Sierra securities during the class period and claims to have been injured by defendants' conduct.  (Id. ¶ 6.)

3

C.     The Alleged Fraud

Plaintiffs contend that during the class period, Sierra "engaged in a scheme to deceive the market . . . that artificially inflated Sierra Wireless' securities . . . by issuing false and misleading statements" to the investing public about the company's major product lines and largest customers.  (Id. ¶ 95.)  According to the complaint, Sierra held itself out as a "market leader" with "a reputation in the wireless data industry for creating state-of-the-art, high-quality products."  (Id. ¶¶ 24, 26.)  However, this carefully cultivated public image was at odds with the alleged truth about Sierra's prospects: the company faced a rapidly eroding market position on several fronts.  In time the truth about Sierra's diminished prospects emerged.  On January 26, 2005 Sierra announced lackluster fourth quarter 2004 results and projected even worse performance in 2005.  (Id. ¶ 83.)  This news triggered a major sell-off of Sierra stock, which fell by thirty-eight percent from the prior day's closing price.  (Id.)

In support of these allegations, plaintiffs claim that Sierra failed to make adequate disclosures about six significant business events.  According to the complaint, Sierra misled the investing public about: (1) its failure to win new business from palmOne, one of its largest customers; (2) the conclusion of its existing business with palmOne at the end of 2004; (3) its excess PC Card inventory, which Sierra planned to "stuff" into its distribution channels; (4) the projected weakness of its PC Card business; (5) the inability of its "smartphone" product to compete successfully in the market; and (6) its decision not to introduce a Universal Mobile Telecommunications System ("UMTS") product in 2005, despite publicly announcing its plans to do so.  (Id. ¶¶ 29, 31, 33, 38, 42, 43, 96.)  Each of these allegations is analyzed in detail below.

1.      *Sierra's Failure to Win New Business from palmOne*

Sierra – a self-professed "market leader" in the distribution of embedded modules to OEMs – purportedly earned twenty percent of its total 2004 revenues from OEM sales to palmOne, which in turn utilized the modules in its popular "Treo 600 smartphone." (Am. Compl. ¶¶ 26-27.)  In 2003, palmOne planned to launch a new model of the Treo and was in the process of selecting a supplier to provide the embedded modules for the new version of that device.  (Id. ¶ 28.)  Citing a "former palmOne new products material manager with personal knowledge of palmOne's business with Sierra Wireless," plaintiffs contend that palmOne informed Sierra executives in late 2003 that Sierra had not been chosen to supply the embedded modules for the new Treo phone.  (Id. ¶¶ 29-30, 59.)  Thus, prior to the start of the class period, Sierra allegedly knew that its OEM module revenues were likely to decline "after palmOne phased out sales of [the Treo 600] phone to make room for its next generation of phones."  (Id. ¶ 29.)

While allegedly aware of this adverse information, Sierra issued the following statements during the class period, which plaintiffs contend were false or misleading:

- On an April 19, 2004 conference call, Sutcliffe stated that he "expect[ed] OEM to continue to be a strong segment," noting that Sierra "spent years investing in building up [its] portfolio of OEM clients and . . . products, and are doing quite well in that area right now."  (Id. ¶ 58.)  On the same call, Cohenour stated that, due to recent OEM wins, "[w]e expect [OEM] to continue to be a healthy business for the foreseeable future."  (Id.)

- On May 4, 2004 – after an analyst had publicly stated that palmOne "has plans to move away from Sierra Wireless" for future Treo models – a Sierra

press released announced that VeriFone "has joined [its] growing roster of embedded module customers" but did not mention Sierra's business prospects with respect to palmOne. (Id. ¶ 62.)

- In a July 21, 2004 press release, Sierra attributed the company's positive second-quarter performance in part to "[d]emand for our . . . embedded module [lines.]"  (Id.)

- On an October 27, 2004 conference call, Cohenour remarked that demand for Sierra's "embedded modules continues to be strong."  (Id. ¶ 76.)

Plaintiffs claim that each of these statements is misleading because of Sierra's failure to acknowledge the impact of palmOne's decision not to award its OEM business for the next generation of Treo phones to Sierra.

### 2.    The Completion of the Existing palmOne Contract

In a related claim, plaintiffs contend that Sierra knew its existing OEM business with palmOne would be completed by the end of 2004 and a significant reduction in its OEM sales would follow.  (Id. ¶ 70.)  Plaintiffs claim that this knowledge made the statements listed in the previous section misleading, as well as Sierra's August 31, 2004 disclosure that it had failed to win the new Treo business, on the theory that Sierra should have also disclosed that all business with palmOne would cease at the end of 2004.  (Id. ¶ 69.)

### 3.    Excess PC Card Inventory and Channel Stuffing

Plaintiffs also allege that Sierra engaged in a "scheme to stuff the [c]ompany's distribution channels with PC Cards that was far in excess of end user demand in order to meet quarterly earnings guidance."  (Id. ¶ 43.)  Plaintiffs contend that such a scheme is

itself unlawful and, in addition, caused Sierra's representations about the strength of its PC Card business to be materially false and misleading. (Id. ¶¶ 43, 78.)

> 4.     *The Strength of the PC Card Business*

Plaintiffs further claim that Sierra made false and misleading statements about the strength of its PC Card business while knowing that this business was plagued with weaknesses.  Specifically, plaintiffs point to the following statements:

- On a January 28, 2004 conference call, Cohenour stated that Sierra was well-positioned to benefit from Verizon's national rollout of its CDMA EV-DO service, as Sierra was "already providing EV-DO PC Cards to Verizon in support of their 2-city trial."  (Id. ¶ 51.)  In response to a question on Sierra's ability to compete in the PC Card market, Sierra responded that "only the paranoids survive" and noted that the company "always anticipate[s] that there will be competition."  (Id. ¶ 52.)

- In a July 21, 2004 press release, Sutcliffe commented on Sierra's positive second-quarter results, noting that "[d]emand for our PC Card, embedded module and mobile product lines are fueling these results."  (Id. ¶ 62.)

- On a July 21, 2004 conference call where Sierra presented a positive outlook for its business units, Cohenour observed that "going forward, [we expect] PC Cards and Voq as a percentage of our revenue mix to trend up."  (Id. ¶ 63.)

- On an October 27, 2004 conference call, Cohenour stated that "[d]emand in Q3 for our EV-DO PC Cards remained strong . . . and we're expecting this trend to continue in Q4.  We also note that Verizon is continuing to expand its network aggressively, and that Sprint is also now planning to deploy.  As an

early innovator in the EV-DO space, we believe we are well positioned to benefit from this network expansion." (Id. ¶ 76.) In response to how Sierra would fare against competitors in the EV-DO PC Card market, Cohenour expressed his belief that Sierra "should be able to win in the space [sic] of that expected competition." (Id. ¶ 77.)

Plaintiffs consider these statements false or misleading because during the class period, Sierra's PC Cards business faced stiff competition from low-cost competitors such as Novatel and Kyocera. (Id. ¶ 37.) Given this competitive environment, plaintiffs assert that Sierra "could not 'survive' in the PC Cards market" and Sierra either knew this reality or recklessly disregarded it when it made the statements quoted above. (Id. ¶ 53.)

5.    The Voq Professional Phone's Failure

In light of its purported setbacks in the OEM and PC Card markets, Sierra allegedly attempted to focus public attention on a new product – the Voq Professional Phone ("Voq") – as a source of future revenue growth for the company. (Id. ¶ 31.) Plaintiffs contend that this amounted to an elaborate ruse, as Sierra knew that "it could not successfully break into the smartphone market with the Voq Professional Phone because major manufacturers . . . dominated the market and had already established significant distribution channels for their smartphone products." (Id.) In addition, plaintiffs claim that the Voq was "poorly designed and exhibited mechanical failures" which defendants never disclosed to the investing public. (Id.) In keeping with these dismal assessments, Voq sales accounted for less than two percent of the company's 2004 revenues and the phone was discontinued the following year. (Id. ¶¶ 31, 50.)

According to plaintiffs, Sierra – despite harboring little real hope for the Voq – made the following statements during the class period:

- In a January 28, 2004 press release, Sierra stated that the Voq phone was among the "new products [expected] to drive future growth."  (Id. ¶ 48.)

- On a January 28, 2004 conference call, Sutcliffe estimated that Voq "could be as much as 20 percent of total revenues."  (Id. ¶ 49.)

- On a July 21, 2004 conference call, Cohenour stated that he expected "Voq as a percentage of our revenue mix to trend up."  (Id. ¶ 63.)

- On an October 27, 2004 conference call, Cohenour stated that fourth quarter 2004 growth would be driven by certain products, including the Voq phone and noted that "Voq will be a significant positive contributor to our financial results."  (Id. ¶¶ 76, 81.)

These statements are alleged to be false and misleading because Sierra did not actually believe that it could succeed in the smartphone market due to (a) stiff competition and (b) the Voq's defective design.

### 6.    *Sierra's Failure to Introduce a UMTS Product in 2005*

Finally, plaintiffs report that Sierra repeatedly advised the public in a series of statements made during the class period that it planned to bring a UMTS product to market in 2005.  (Id. ¶¶ 54, 60, 67, 79.)  However, despite these announcements, Sierra allegedly had no plans to do so because competitors already dominated the UMTS market.  (Id. ¶¶ 38, 55.)  Plaintiffs claim that Sierra had decided in the beginning of 2004 not to develop a UMTS PC Card (id.) and therefore, Sierra's announced plans to bring a UMTS product to market in 2005 were false and misleading.

9

## II.    DISCUSSION

### A.    Standard of Review

The Court will grant a motion to dismiss pursuant to Rule 12(b)(6) only "where it appears beyond doubt that the plaintiff can present no set of facts entitling him to relief." Chosun Int'l v. Chrisha Creations, Ltd., 413 F.3d 324, 327 (2d Cir. 2005).  When deciding a motion to dismiss, the Court assumes the truth of all facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiffs. See Shah v. Meeker, 435 F.3d 244, 246 (2d Cir. 2006) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).  Thus, at this stage of the proceedings, the Court's focus is on the sufficiency of the pleadings and not the weight of the evidence that might be presented at trial.  See Chosun, 413 F.3d at 327.  However, it is appropriate for the Court to consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC . . . ." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (citing Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

### B.    Section 10(b) and Rule 10b-5 Claims

#### 1.    *Legal Standard*

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice "in connection with the purchase or sale of any [registered] security." 15 U.S.C. § 78j(b).  Rule 10b-5 – which was promulgated by the Securities and Exchange Commission pursuant to section 10 of the Exchange Act – states that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To state a claim pursuant to section 10(b) and Rule 10b-5, a plaintiff must adequately allege the following elements: "(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' (5) economic loss, and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (internal citations omitted).

Complaints alleging securities fraud must also comply with the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Fed. R. Civ. P. 9(b) requires that "the circumstances constituting fraud . . . shall be stated with particularity" in the complaint. A "complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Shields v. Citytrust Bancorp., 25 F.3d 1124, 1127-28 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint

11

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b).  While the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based," plaintiffs must "plead with particularity sufficient facts to support those beliefs."  Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000).  As a result, courts focus "on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  Id. at 314 n.1.

Pursuant to the heightened pleading standard of Rule 9(b) and the PSLRA, securities fraud actions based on an "an unsupported general claim" constitute "bare pleadings" that cannot survive a motion to dismiss.  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72-73 (2d Cir. 2001).  For example, plaintiffs cannot simply allege that confidential company sales reports contradicted contemporaneous public statements, thereby making them false or misleading.  Instead, they must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them."  Id.; see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812-813 (2d Cir. 1996).

Finally, the Second Circuit does not recognize "fraud by hindsight" and has stated that "misguided optimism is not a cause of action, and does not support an inference of fraud."  Shields, 25 F.3d at 1129.  Similarly, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks omitted).

2.      *Application to Plaintiff's Allegations*

a.      <u>Sierra's Failure to Win New Business from palmOne</u>

Plaintiffs claim that a series of optimistic statements made by Sierra concerning its OEM module business are actionable because they were made when Sierra knew that it would not supply the modules for palmOne's next generation Treo.  Plaintiffs do not contend that Sierra represented to the public that it expected to win the new Treo contract while knowing that, in fact, it had not won that business.  Rather, they claim that Sierra's broadly optimistic statements about its OEM business were misleading because without the new Treo contract, Sierra's OEM business was essentially doomed.  Because plaintiffs have failed to plead this claim with the requisite particularity, it is dismissed.

Sutcliffe's comments on the April 19, 2004 conference call – where he stated that he "expect[ed] OEM to continue to be a strong segment" (Am. Compl. ¶ 58) – and Cohenour's comments on the same call – where he expressed his expectation that OEM would "continue to be a healthy business for the foreseeable future" (<u>id.</u>) – constitute broadly optimistic pronouncements on the future of Sierra's OEM business.  In general, such statements are considered "expressions of puffery and corporate optimism [which] do not give rise to securities violations." <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004).  The Second Circuit has explained the rationale for this principle: "[C]ompanies must be permitted to operate with a hopeful outlook . . . [and] are not required to take a gloomy, fearful or defeatist view of the future." <u>Id.</u> (internal quotation marks omitted).  Nevertheless, if a corporation issues an optimistic statement that lacks a basis in fact or is undermined by non-disclosed facts of which the speaker is aware, the statement may be actionable under the securities laws. <u>See</u> <u>In re IBM Corp. Sec. Litig.</u>, 163 F.3d 102, 107

(2d Cir. 1998) ("Statements regarding projections of future performance may be actionable under section 10(b) or Rule 10b-5 . . . if the speaker does not genuinely or reasonably believe them.") (citations omitted).  In order to succeed on this type of claim, however, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  Rombach, 355 F.3d at 174.  This requirement is consistent with the heightened pleading standard mandated by Rule 9(b) and the PSLRA for allegations of securities fraud.

As plaintiffs observe, Sierra's failure to win the new palmOne business – which they contend was clear to Sierra executives by the end of 2003 – would not impact sales figures until 2005 (Am. Compl. ¶ 33) and in the meantime Sierra was purportedly exploring other options to boost its revenue (id. ¶ 31).  Therefore, when Sierra's officers announced that they "expect[ed] OEM to continue to be a strong segment" and a "healthy business for the foreseeable future," Sierra did not necessarily have any reason to fear an imminent collapse of its OEM business, and plaintiffs' allegations do not indicate that they should have.  Indeed, for the remainder of the year, OEM sales – including OEM sales to palmOne – appear to have been strong, and it was only in the first quarter of 2005 that OEM sales fell, thus prompting plaintiffs' allegations of securities fraud.[1]  (Id. ¶¶ 72, 84.)  Thus, plaintiffs have not adequately demonstrated that Sierra's failure to win new business from palmOne was so significant and irreversible a blow to its OEM unit that it undermined the company's optimistic statements about that business generally.  Without such a showing, plaintiffs' claim arising from the April 19 statements do not satisfy the requirement of particularity mandated by Rule 9(b) and the PSLRA.

---

[1] By then, however, Sierra investors had been on notice for the prior four months that Sierra had not won the new Treo contract from PalmOne.  (Id. ¶ 69.)  Investors had also been aware that Sierra expected "OEM as a percentage of revenue mix to trend down" since July 2004.  (Id. ¶ 63.)

The May 4, 2004 announcement that VeriFone had joined the "growing roster of embedded module customers" is similarly not actionable, because plaintiffs have not adequately pled that it is false or misleading.  Plaintiffs claim that the statement is contradicted by palmOne's decision not to award the new Treo business to Sierra.  However, plaintiffs concede that palmOne remained a Sierra customer through the end of 2004 (id. ¶ 72) and plaintiffs do not claim that Sierra lost any OEM customer during this period or that VeriFone did not in fact become a Sierra customer.  Therefore, the May 4, 2004 statement was literally true.  In addition, Sierra's failure to win new business from an existing customer does not so undermine this statement as to make it misleading because no reasonable investor would believe that Sierra's announcement indicated that it always won every business opportunity from its "growing roster" of OEM customers.

Plaintiffs' claim arising from the July 21, 2004 press release attributing Sierra's positive second-quarter performance to OEM demand suffers from the same defect: Plaintiffs have not adequately pled that this statement is false or misleading.  Plaintiffs do not allege that Sierra's OEM business was not strong in the second quarter of 2004, but instead urge that this statement was misleading because of the likely adverse effects of not winning the new palmOne business.  While palmOne's decision may have presented an obstacle to Sierra's future OEM performance, it did not contradict, undermine or refute the statement of historical fact made in the July 21, 2004 press release – that OEM demand contributed to Sierra's second-quarter performance – and plaintiffs do not question that statement's accuracy.  Therefore, this statement is not actionable under the federal securities laws.  See, e.g., In re WorldCom, Inc. Sec. Litig., 303 F. Supp. 2d 385, 387 (S.D.N.Y. 2004) (holding that an "accurate description of historical prices" cannot

support a securities fraud claim); In re Duane Reade Inc. Sec. Litig., No. 02-cv-6478, 2003 U.S. Dist. LEXIS 21319, at *23 (S.D.N.Y. Nov. 25, 2003) (The "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.") (quoting In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997)).

For the same reason, Cohenour's comment on the October 27, 2004 conference call that the "embedded modules [business] continues to be strong" is not actionable, as plaintiffs do not contend that OEM demand was in fact weak when Cohenour described it as "strong." In addition, by the time that statement was made, Sierra had already disclosed that it had not won the new Treo business. (Am. Compl. ¶ 69.) As a result, Cohenour's comment was made at a time when the investing public was well aware that Sierra would not supply palmOne with embedded modules for the new Treo, and therefore the statement could not have been misleading even under plaintiffs' theory.

To be sure, Sierra's inability to obtain the new Treo business from palmOne was a significant setback for the company. However, plaintiffs have not adequately pled that this setback was so insurmountable that it rendered Sierra's positive statements about its OEM business materially misleading. See Rombach, 355 F.3d at 173-74 (rejecting allegations of fraud based on the nondisclosure of events that were "consistent with unremarkable circumstances short of financial peril or instability."). Indeed, Sierra publicly disclosed that it did not win the new Treo business in August 2004, a full four months before that loss would begin to impact 2005 earnings. For these reasons, plaintiffs' claims based on the above statements fail.

b.      The Completion of the Existing palmOne Contract

Plaintiffs contend that the statements listed in the previous section – as well as Sierra's August 31, 2004 disclosure that it had failed to win the new Treo business without commenting on the status of its existing plamOne business – are misleading because Sierra knew its existing OEM business with palmOne would be completed by the end of 2004 and a significant reduction in its OEM sales would follow.  (Am. Compl. ¶¶ 69, 70.)  Plaintiffs cite nothing to support their claim that Sierra knew that its existing business with palmOne would conclude at year end prior to publicly disclosing this fact on October 27, 2004 (id. ¶ 72) and therefore have failed to plead this claim with particularity as required by Rule 9(b) and the PSLRA.

Under Rule 9(b) and the PSLRA, plaintiffs must "supply sufficient specific facts to support their allegations." Novak, 216 F.3d at 314.  This pleading requirement can be met by "providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs" including well-placed confidential sources. (Id.)  Here, however, plaintiffs supply no facts whatsoever to support their allegations that Sierra knew about the termination of its existing business with palmOne prior to Sierra's public disclosure to that effect on October 27, 2004.  All plaintiffs offer are conclusory allegations that Sierra knew its palmOne business was winding down at the same time that it issued generally positive statements about its OEM business unit.  These allegations do not satisfy the heightened pleading requirements applicable in this case and, as a result, plaintiffs' claims based on Sierra's alleged undisclosed knowledge of the imminent completion of palmOne's OEM contract are dismissed.

c.      Excess PC Card Inventory and Channel Stuffing[2]

In support of their allegation that Sierra engaged in a "scheme to stuff the

[c]ompany's distribution channels with PC Cards that was far in excess of end user

demand" (Am. Compl. ¶ 43), plaintiffs point to the comments of a former Sierra

marketing director, who stated that "there was a pretty solid amount in the inventory [of

PC Cards] as far as product sitting out there, meanwhile, the next competitors came in."

(Id. ¶¶ 43, 78.)  This statement appears to suggest that Sierra had produced a significant

quantity of PC Cards and faced stiff competition in selling them, but it does not imply

that Sierra coerced its customers to accept more PC Cards than they wanted and therefore

does not support plaintiffs' channel-stuffing claim.  See Gavish v. Revlon, Inc., No. 00-

cv-7291, 2004 U.S. Dist. LEXIS 19771, at *52 (S.D.N.Y. Sept. 30, 2004) ("[T]here is

nothing inherently improper in pressing for sales to be made earlier than in the normal

course. . . .") (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999)).

Next, plaintiffs turn to an anonymous "founder" of AirPrime – a wireless

technology company acquired by Sierra – who claims that "Sierra was stuffing the

distribution network in an effort to make its earnings numbers that they had forecast to

Wall Street."  (Id. ¶ 78.)  While plaintiffs may rely on confidential sources to satisfy the

pleading requirements of Rule 9(b) and the PSLRA, the source must be "described in the

complaint with sufficient particularity to support the probability that a person in the

position occupied by the source would possess the information alleged."  See Novak, 216

F.3d at 314.  Plaintiffs do not indicate that an AirPrime founder – with an unspecified

---

[2] Channel stuffing is a scheme which temporarily overstates revenues by persuading customers to accept product deliveries despite the absence of commensurate demand, often on the understanding that excess product can be returned to the seller at a later time.  See In re Nat'l Austl. Bank Sec. Litig., No. 03-cv-6537 2006, U.S. Dist. LEXIS 94162, 22-23 (S.D.N.Y. Oct. 25, 2006).

role (if any) at Sierra during the class period – would be in a position to know about Sierra's strategy for selling its PC Cards and whether that strategy included channel stuffing.  In effect, the former AirPrime founder merely parrots the conclusory allegations contained in the complaint.  As a result, plaintiffs have not satisfied the heightened pleading requirements for their channel-stuffing claim, which is therefore dismissed.

d.   <u>The Strength of the PC Card Business</u>

Plaintiffs' claim that Sierra made false and misleading statements about the strength of its PC Card business while knowing that this business was plagued with weaknesses also falls short of the standard for pleading claims of securities fraud.  This claim is premised on plaintiffs' belief that Sierra faced stiff competition from low-cost competitors in the PC Cards market and Sierra could not compete successfully in this competitive environment.  (Am. Compl. ¶¶ 37, 53.)

As discussed previously, corporate executives are not required to adopt a "gloomy, fearful or defeatist view of the future" under the securities laws.  <u>Rombach</u>, 355 F.3d at 174 (internal quotation marks omitted).  Even so, they are not permitted to make optimistic statements that they do not "genuinely or reasonably believe" to be true.  <u>In re IBM</u>, 163 F.3d at 107.  While plaintiffs claim that Sierra could not have reasonably believed in its ability to compete against lower-cost rivals in the PC Cards market, they fail to allege any specific fact that provides support for this assertion.  Plaintiffs do offer specific support for their claim that the market for PC Cards was competitive and that Sierra's cards were priced at the high end of the market (Am. Compl. ¶ 42), but the mere fact that the market was competitive does not suggest that Sierra knew that it could not

successfully compete in it.  As a result, the claim is conclusory and therefore barred by Rule 9(b) and the PSLRA's requirement that securities fraud be pled with particularity.

In addition, plaintiffs consider Cohenour's statements on the October 27, 2004 conference call to be actionable on the alternative grounds that these statements were undermined by Sierra's knowledge that it would not be Verizon's PC Card supplier for the planned EV-DO network expansion.  In support of this assertion, plaintiffs rely on a "former Sierra Wireless marketing director" who represents that Sierra "knew by the beginning of the fourth quarter of 2004 that Verizon Wireless had rejected Sierra Wireless as a PC Cards supplier for its nationwide EV-DO rollout.[3]  (Id. ¶¶ 43, 78.)  As additional support for this claim, plaintiffs point out that Verizon's practice – according to two Novatel officers who dealt with Verizon – was to inform its suppliers of expected demand at least three months in advance of placing orders.  (Id. ¶ 43.)  According to plaintiffs, this corroborates the marketing director's assertion that Sierra would have been aware of a decline in demand from Verizon at the beginning of the fourth quarter.  (Id.)  Thus, plaintiffs have adequately pled that Sierra knew that it would not supply PC Cards for Verizon's nationwide EV-DO rollout.

While plaintiffs have adequately pled Sierra's knowledge that it would not be Verizon's PC Card supplier for the nationwide rollout, this fact does not make Cohenour's October 27, 2004 statements false or misleading.  At the conference call, Cohenour explained that "Verizon is continuing to expand its network aggressively" and that "Sprint is also now planning to deploy" an EV-DO network.  (Id. ¶ 76.)  In other

---

[3] Because the former marketing director alleges that Sierra knew this information "by the beginning of the fourth quarter of 2004" – i.e., no earlier than October 1, 2004 – only the October 27, 2004 statements are actionable under this theory, as the other optimistic statements concerning the PC Card business were made prior to October 1.

words, Cohenour described the adoption and expansion of EV-DO technology by mobile service providers.  Next, he observed that Sierra was "an early innovator in the EV-DO space" which he believed made Sierra "well positioned to benefit from this network expansion" and "to win" business despite "expected competition." (Id. ¶¶ 76-77.)  In these remarks, Cohenour did not claim that Sierra had won or expected to win the contract for Verizon's EV-DO network roll-out, which would have been false in light of Sierra's knowledge that it had not won that business.  Instead, Cohenour expressed his belief that Sierra was in a position to benefit from the accelerating adoption of EV-DO technology by mobile service providers.

While losing the Verizon contract was surely a setback for Sierra, plaintiffs have not alleged facts showing that the loss would have invalidated Sierra's belief that it was "well positioned" to benefit from other Verizon EV-DO contracts, Sprint's EV-DO network or the potential EV-DO business of other companies.  It is too far a leap to assume that the failure to win a single contract from a single customer – even a large and important one such as Verizon – would completely undermine Sierra's expectations in an expanding field where it had been an early innovator.  See Rombach, 355 F.3d at 173-74. Having failed to allege facts showing that Sierra's failure to win the Verizon contract was so serious a loss that it made misleading Sierra's belief that it was "well positioned" to compete in the EV-DO market, plaintiffs have failed to plead this claim adequately pursuant to the standards set forth in Rule 9(b) and the PSLRA.

e.      The Voq Professional Phone's Failure

With respect to Sierra's optimistic statements about the prospects of its Voq Professional Phone ("Voq"), plaintiffs contend that these statements are false and

21

misleading because Sierra did not actually believe that it could succeed in the smartphone market due to (a) stiff competition and (b) the Voq's defective design.  However, these allegations are inadequately pled and therefore cannot survive defendants' motion to dismiss.

Plaintiffs fail to allege any facts showing that Sierra knew it could not succeed in the smartphone market due to intense competition.  As with many of plaintiffs' claims, this is simply a conclusory allegation that cannot withstand the heightened pleading standard of Rule 9(b) and the PSLRA.  In re Scholastic, 252 F.3d at 72-73 ("[U]nsupported general claims" and "bare pleadings" in a securities fraud action cannot survive a motion to dismiss).

However, plaintiffs' claim that the Voq presented mechanical problems is supported by the comments of a "former Sierra Wireless staff engineer who had personal knowledge of Sierra Wireless' development of the Voq."  (Am. Compl. ¶ 50.)  He claims that Sierra was "a year late" to the smartphone market and "there were a lot of mechanical problems with it because their design team had never designed a phone before."  (Id.)  Even assuming the truth of these observations, they do not indicate that Sierra's optimistic statements about the Voq were false or misleading.  Sierra did not represent that its design and development of the Voq had been flawless from inception. In fact, it is to be expected that a manufacturer would face some mechanical difficulties when embarking on a new product line, and the staff engineer does not suggest that the Voq's "mechanical problems" were more substantial than would be expected, or that they were insurmountable, or that Sierra believed that they doomed the product offering. Furthermore, plaintiffs do not allege that Sierra failed to remedy these problems or that

the Voq was, in fact, plagued with mechanical problems when it was released.  In short, plaintiffs have not alleged that the Voq's mechanical problems were so severe that they undermined Sierra's expectations of success.  See Rombach, 355 F.3d at 173-74.

Moreover, the staff engineer does not state when Sierra first learned of the Voq's mechanical problems or even if any problems existed when the defendants made the optimistic statements noted above.  In order for a statement to be false or misleading, a plaintiff must allege that the speaker was aware of adverse information at the time he spoke.  See In re IBM, 163 F.3d at 107.  Plaintiffs have not pled – and the staff engineer has not alleged – that Sierra or Sierra's officers were aware of Voq's mechanical problems when they made any of the statements listed above.  This lack of temporal specificity further dooms plaintiffs' argument that Sierra's optimistic statements about Voq were contradicted by its mechanical problems.  Rothman, 220 F.3d at 91 ("Although the [plaintiffs] do not have to fix the exact date and time that [defendants] became aware that recovering royalty payments through future sales would be unlikely, they must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged.") (internal quotation marks omitted).

In the final analysis, plaintiffs' complaints about the Voq phone fall within the category of "fraud by hindsight."  Plaintiffs believe that Sierra's decision to develop the Voq was misguided: it alienated palmOne (Am. Compl. ¶ 32); it embraced a disfavored Microsoft platform (id. ¶ 34); it was not likely to succeed based on the competitive environment (id. ¶ 50); and it was outside Sierra's core competency (id. ¶ 89).  Indeed, Sierra ultimately did abandon the Voq product line in 2005.  (Id.)  Accepting all of this as

true, it is possible that Sierra's decision to develop the Voq was ill-advised, but bad business decisions are not actionable under the securities laws, see Rothman, 220 F.3d at 90 ("Generally, poor business judgment is not actionable under section 10(b) and Rule 10b-5."), and therefore plaintiffs' claims concerning the Voq phone are dismissed.

f.    Sierra's Failure to Introduce a UMTS Product in Early 2005

Plaintiffs' claims arising from a series of statements in which Sierra advised the public that it planned to bring a UMTS product to market in early 2005 are premised on the belief that Sierra actually had no plans to do so.  (Am. Compl. ¶¶ 38.)  In support of this claim, plaintiffs contend that (1) Sierra's entry in 2005 would have been too late as other UMTS manufacturers had "already established significant shares of the UMTS market" sufficient to block late entrants and (2) Sierra had decided "as early as the beginning of 2004 against developing a UMTS PC Card."  (Id. ¶¶ 38, 55.)  Therefore, from plaintiffs' perspective, Sierra's announced plans to bring a UMTS product to market in early 2005 were false or misleading.

Plaintiffs do not allege any particular facts showing that Sierra's planned 2005 entry into the UMTS market would have been blocked by competitors who already dominated the market, nor do they allege that such facts were before Sierra when it announced its plans to launch a UMTS product in the first half of 2005.  At most, plaintiffs contend that Sierra must have known – or was reckless not to have known – that introducing a UMTS product in 2005 would be futile, but plaintiffs have alleged no facts in support of that contention.  Therefore, plaintiffs have failed to plead their claim with sufficient particularity.  See Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b); Novak, 216 F.3d at 313-314 (While the PSLRA "does not require that plaintiffs plead with particularity

every single fact upon which their beliefs concerning false or misleading statements are based," plaintiffs must "plead with particularity sufficient facts to support those beliefs.")

Plaintiffs further rely on the observations of a "former Sierra Wireless product manager" who claims that Sierra had "decided as early as the beginning of 2004 against developing a UMTS PC Card."  (<u>Id.</u> ¶ 38.)  Even if this Court were to assume that this product manager was in a position to know Sierra's plans with respect to UMTS product development, <u>see</u> <u>Novak</u>, 216 F.3d at 314 (a confidential source must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"), his statement that Sierra had no plans to develop a UMTS <u>PC Card</u> does not make Sierra's announcements of its plans to develop a UMTS <u>product</u> false or misleading.  Indeed, in each of the announcements that plaintiffs claim are misleading, Sierra refers only to a "UMTS product," not a "UMTS PC Card."  (<u>Id.</u> ¶¶ 54, 60, 67, 79.)

Looking at the statements in context, it is clear that Sierra consistently distinguished between a UMTS product and a UMTS PC Card.  For instance, on an April 19, 2004 conference call, Cohenour responded to a question about the production of a "UMTS card" by correcting the questioner's assumption.  Cohenour explained that "we want to stay nimble on what product variant we do first.  And, product variance, you can guess what they may be.  They may be PC cards.  They may be embedded modules.  It might be VOQ.  So, we're staying nimble on that."  (Declaration of Jaculin Aaron ("Aaron Decl."), Ex. R: Sierra's Q1 2004 Earnings Conference Call at 9.)[4]  Similarly, on

---

[4] The complaint quotes from portions of Sierra's Earnings Conference Calls for the fourth quarter of 2004 and all four quarters of 2005.  (See, e.g., Am. Compl. ¶¶ 49, 57, 63, 74, 85.)  Defendants have placed the full transcripts of these calls in the record (Aaron Decl., Ex. Q – U), and these transcripts are appropriately considered by the Court on this motion to dismiss, <u>see</u> <u>Rothman</u>, 220 F.3d at 88.

an October 27, 2004 conference call, Sutcliffe clarified that "Sierra had not been specific, that the first product, or any particular product in the UMTS category will be a PC Card." (Aaron Decl., Ex. T: Sierra's Q3 2004 Earnings Conference Call at 13.)

Based on this well-maintained distinction between a generalized UMTS <u>product</u> on one hand, and a specifically UMTS PC <u>Card</u> on the other, no reasonable investor would have believed that Sierra's announced plans to bring one of the possible UMTS products to market in early 2005 necessarily entailed the introduction of a UMTS PC Card. Therefore, plaintiffs' allegation that Sierra had no plans to launch a UMTS PC Card in 2005 does not make the company's statements concerning its UMTS product plans false or misleading.

In addition, Sierra's UMTS announcements are protected by the PSLRA's "safe harbor" because each was "identified as a forward-looking statement, and . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 115 U.S.C. § 78u-5(c)(1)(A)(i). To determine whether cautionary language is meaningful, courts undertake a two step process: "First, they identify the allegedly undisclosed risk" and then "read the allegedly fraudulent materials – including the cautionary language – to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." <u>Halperin v. Ebanker USA.com</u>, 295 F.3d 352, 359 (2d Cir. 2002) (discussing analysis in context of analogous "bespeaks caution" doctrine). If the court determines that "no reasonable investor could have been misled about the nature of the risk when he

invested" then the "complaint fails to state a claim of securities fraud" and must be dismissed.  Id.

Here, the allegedly undisclosed risk was that Sierra would not introduce a UMTS product in the first half of 2005 despite having announced its plans to do so.  A reasonable investor would have been on notice that that this risk existed based on the cautionary statements accompanying each of Sierra's announcements concerning UMTS. On the January 28, 2004 conference call, Cohenour observed:

> [F]rom a UMTS network launch standpoint, as you have mentioned, we have seen some noise, in particular out of Europe, a little bit out of AT&T. Over the course of 2004 we expect to see limited commercial service launches by carriers - both in Europe and in North America.  We are watching that very closely; we do indeed have a plan to bring a UMTS product to market.  But I wouldn't expect to see that until early 2005 and that's when we believe the networks will be deployed in critical mass and there will actually be a significant user base and opportunity to sell the products through.

(Aaron Decl., Ex. Q: Sierra's Q4 2003 Earnings Conference Call at 7.)  Based on these comments, a reasonable investor would have been aware that Sierra's UMTS plans were contingent on Sierra projections of when a "critical mass" of networks and a "significant user base" would arise.

On Sierra's next quarterly conference call – held on April 19, 2004 – Cohenour explained that Sierra had not yet selected a "form factor" (or a product format) for the UMTS technology, noting that the company wanted to "stay[] nimble on that."  (Id., Ex. R: Sierra's Q1 2004 Earnings Conference Call at 9.)  He then expressed Sierra's "expect[ation that] the first product variant will be launched in the first half of 2005." (Id.)  Also on that call, Sutcliffe responded to a question about the timing of a UMTS product launch by saying that the company was "not planning to indicate any changes to

market introduction timing . . . [for] the UMTS product family, which . . . we're going to start introducing in the first half of '05.  And I don't think we want to suggest that we're going to change those timeframes at this point." (Id. at 8.)  Taken together, these statements indicate: (1) Sierra's planned launch of a UMTS product was at such an early stage that the company had not yet selected a product format and (2) changes to the product launch timeframe may be necessary, even though Sierra felt no need to alter it "at this point."  A reasonable investor could not have read these statements to foreclose the risk that subsequent events could compel Sierra to alter its product launch timeline such that no UMTS product would be introduced in the first half of 2005.

Similarly on the July 21, 2004 conference call covering Sierra's second quarter performance, Cohenour reiterated that Sierra had not "specified what product form factor will hit the market first.  But we do anticipate that our first UMTS product will hit the market in the first half of 05." (Id., Ex. S: Sierra's Q2 2004 Conference Call at 7.) Sutcliffe later explained that Sierra did not plan to rush into the UMTS market because Sierra "would prefer to enter the market with a product that has significant differentiation." (Id. at 11.)  These statements indicate that Sierra's deliberations on how to enter the UMTS market were on-going and that the important decisions – including the selection of a product form factor and how to adequately differentiate the product offering – remained unresolved.  With those circumstances in mind, Sierra predicted an early 2005 launch date.  In light of the stated contingencies, however, no reasonable investor would take that prediction as a guarantee against the risk that a UMTS product would not come to market.

Finally, during the third quarter conference call held on October 27, 2004, Cohenour responded to a question on the timing of a UMTS product launch by reiterating Sierra's prior guidance that a UMTS product was expected to come to market during the first half of 2005.  He then elaborated that Sierra had laid out "a product road map for which – which form factors we'll come to market with first, and that's something from a product – from a commercial announcement point of view we're just not ready to do yet." (Id., Ex. T: Sierra's Q3 2004 Conference Call at 9.)  As with the statements discussed above, these comments would put a reasonable investor on notice that Sierra's plans to launch a UMTS product in 2005 were contingent on other factors, thus creating a risk that the product would not be launched as planned.

Because each forward-looking UMTS statement cited by plaintiffs as false or misleading was accompanied by meaningful cautionary language, the statements are considered immaterial under the PSLRA safe harbor.  See In re Gilat Satellite Networks, Ltd., No.02-cv-1510, 2005 U.S. Dist. LEXIS 41996, at *35 (E.D.N.Y. Sept. 19, 2005) ("Once a court determines that a forward-looking statement is accompanied by cautionary language sufficiently meaningful as to render it incapable of being reasonably relied upon, it is immaterial as a matter of law" under the PSLRA.); see also Halperin, 295 F.3d at 357.  Therefore, these statements are not actionable under the securities laws, and plaintiffs' claims arising from them are dismissed.

      C.     Section 20(a) Claims

In addition to their section 10(b) and Rule 10b-5 claims, plaintiffs also assert control person liability against the Sierra Officers – Sutcliffe, McLennan, and Cohenour – pursuant to section 20(a) of the Exchange Act.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under
> any provision of this title or of any rule or regulation thereunder shall also
> be liable jointly and severally with and to the same extent as such
> controlled person to any person to whom such controlled person is liable,
> unless the controlling person acted in good faith and did not directly or
> indirectly induce the act or acts constituting the violation or cause of
> action.

15 U.S.C. § 78t(a).  In order to establish control person liability, a plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant."  <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472 (2d Cir. 1996).

As discussed above, plaintiffs have not adequately alleged that the "controlled person" – in this case Sierra – has violated the Exchange Act.  Thus, plaintiffs cannot state a claim for control person liability against the Sierra Officers and therefore plaintiffs' claims brought pursuant to section 20(a) of the Exchange Act are dismissed.

D.    <u>Compliance with Rule 11(b)</u>

Pursuant to its statutory obligation, this Court finds that the parties and counsel in this matter have complied with Rule 11(b).  <u>See</u> 15 U.S.C. § 78u-4(c)(1); <u>Rombach</u>, 355 F.3d at 178 ("The PSLRA mandates that, at the end of any private securities action, the district court must 'include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b).'") (quoting 15 U.S.C. § 78u-4(c)(1)).

## III.    CONCLUSION

Because plaintiffs have not pled their securities fraud claims with the requisite level of particularity, they have failed to state a claim upon which relief can be granted.  Therefore, defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted without prejudice.  If plaintiffs intend to

submit a second amended complaint, they shall do so within 21 days of the entry of this

Opinion and Order.

Dated: New York, New York
        April 18, 2007

SO ORDERED:

Sidney H. Stein, U.S.D.J.